ALEX G. TSE (CABN 152348)
Acting United States Attorney

BARBARA J. VALLIERE (DCBN 439353)
Chief, Criminal Division

FRANK J. RIEBLI (CABN 221152)
KATHERINE L. WAWRZYNIAK (CABN 252751)
Assistant United States Attorney

    1301 Clay Street, Suite 340S
    Oakland, California 94612
    Telephone: (510) 637-3680
    FAX: (510) 637-3724
    Frank.Riebli@usdoj.gov
    Katherine.Wawrzynia@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 16-382 HSG |
| Plaintiff, | |
| v. | GOVERNMENT'S SENTENCING MEMORANDUM |
| JORGE GOMEZ, | |
| Defendant. | Date: June 18, 2018<br>Time: 2:00 p.m. |

## I. INTRODUCTION

Jorge GOMEZ built and maintained several marijuana grow houses for his co-defendant Oscar Esclante's drug trafficking organization. Though GOMEZ was not in charge of the organization, his own actions and his statements to Oscar and others during the existence of the conspiracy indicate that he had an important role and that he was invested in the conspiracy's success. Indeed, he recruited others into the organization, including three of his co-defendants in this case, and then reprimanded at least one of them when he failed to perform as expected. GOMEZ and the government agreed to a 60-month prison term, followed by 4 years of supervised release. Probation concurs. The government thus asks that the Court accept the parties' agreement and impose that sentence.

## II. FACTS

GOMEZ was the general contractor for co-defendant and ring-leader, Oscar Escalante. Oscar managed conspiracies to manufacture and distribute marijuana both in and outside of California, and to distribute heroin and methamphetamine. GOMEZ converted residences (and one business) into grow houses for Oscar. Pre-Sentence Report ("PSR") ¶ 23. The work he did was extensive: he bypassed the utility meter, installed a new electrical system in the house, installed irrigation and air conditioning and filtration systems, hung the high-intensity grow lights, and built walls and sealed gaps to ensure total control over light sources, prevent outsiders from seeing the plants inside the house, and prevent the strong odor of marijuana plants from escaping to the outside air. Id. ¶¶ 23-29.

After he constructed the grows, he maintained the equipment and provided advice to Oscar's workers on how to operate it. Id. ¶ 23. For example, in May 2016, Oscar and GOMEZ discussed whether the workers at one grow house were overwatering. He told Oscar that "there's a little puddle inside the room, I saw it last night. Whoever watering that shit's overwatering." GOMEZ added that "[t]hese guys don't listen." And in June 2016, GOMEZ had exchanged chats with the woman tending the grow at 2512 Bugle Way in Antioch in which they discussed whether her failure to follow his instructions had resulted in one of the grow rooms overheating and all the plants dying. PSR ¶ 23.

GOMEZ also maintained his own grow house in El Cerrito, until his landlord discovered it and evicted him and his girlfriend. Id. ¶ 31.

And GOMEZ recruited others to join Oscar's organization. Id. ¶ 32. He brought in co-defendants Brandon Lingo, Christopher Mir, and James Hinkle. Id. GOMEZ arranged for Mir to travel to California from North Carolina to work in the grow on Yacht Drive in Discovery Bay for a trial period in May 2016. Id. ¶ 30. He then coordinated Mir's return to join the organization and work in the grow house longer-term. Id. Though the people GOMEZ recruited worked for Oscar, GOMEZ retained some managerial responsibilities over them. Thus, when Lingo offered excuses for missing a meeting with other members of the conspiracy, GOMEZ gave him an extensive lecture on the importance of communication and taking accountability for his actions. Id. ¶ 32. GOMEZ may have delivered his lecture in street lingo, but it was a speech that any human resources professional in any company could have delivered to an employee who was failing to perform as expected.

The grand jury charged GOMEZ with one count of conspiring to manufacture, distribute and possess with intent to distribute 100 or more marijuana plants. On February 12, 2018, GOMEZ entered into a plea agreement in which he admitted that offense. Docket # 443. As part of his plea, GOMEZ admitted that he knew the conspiracy involved "well over 100 marijuana plants." Plea Agmt ¶ 2. He further admitted that the grow houses that he knew about produced a combined total of at least 2,247 plants over time. Id. GOMEZ's plea was part of a group of mutually contingent plea agreements that he and six co-defendants (including Oscar Escalante) executed.

### III. DISCUSSION

The Court must impose a sentence sufficient, but not greater than necessary, to reflect the seriousness of the offense, deter others from committing similar crimes, protect the public from the defendant, and rehabilitate the defendant. 18 U.S.C. § 3553(a)(2); United States v. Carty, 520 F.3d 984, 991 (9th Cir. 2008). The statute sets forth several factors that the Court must consider in determining a just sentence: (1) the nature and circumstances of the offense and the defendant's history and characteristics; (2) the purposes of sentencing; (3) the kinds of sentences available; (4) the Guidelines range for sentences; (5) any pertinent policy statements; (6) the need to avoid unwarranted sentencing disparities and the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a); Carty, 520 F.3d at 991. The Guidelines should be the starting point and the initial benchmark. Gall v. United

States, 552 U.S. 38, 49 (2007). Though the guidelines are not binding, they "reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives." Rita v. United States, 551 U.S. 338, 350 (2007).

### A. GOMEZ's Guidelines Range is 60 Months.

The government calculates GOMEZ's Guidelines range as follows:

| | |
|---|---|
| Base Offense Level, § 2D1.1(c)(8) | 24 |
| Specific Offense Characteristic:<br>    Maintaining a premises:  § 2D1.1(b)(12) | +2 |
| Acceptance of Responsibility, § 3E1.1 | -3 |
| Early Disposition, § 5K2.0(a)(2)(B) | -2 |
| Total Offense Level | 21 |
| Criminal History Category (0 points) | I |
| Range | 60 |

#### 1. The Base Offense Level is 24.

The offense level in a drug case is determined by the aggregate weight of the drugs for which the defendant is responsible. U.S.S.G. § 2D1.1 applic. notes 5, 7. The parties agreed that GOMEZ is responsible for the equivalent of 224.7 kilograms of marijuana. Plea Agmt ¶ 2. The drug quantity is based on the number of plants produced at seven of the organization's grow houses over the estimated production life of each grow house. The government attributes those seven grow houses to GOMEZ because pole camera video, intercepted communications, and evidence recovered from GOMEZ's phone demonstrate his involvement with those houses. Probation agrees with this attribution. PSR ¶ 33. That quantity corresponds to a base offense level 24. U.S.S.G. § 2D1.1(c)(8) (100 kg to 400 kg).

#### 2. GOMEZ Maintained Drug-Involved Premises.

The parties agreed to a two-level enhancement for maintaining a drug-involved premises because GOMEZ built and maintained the organization's marijuana grows, and because he operated his own indoor grow for some period in an apartment he rented in El Cerrito. Plea Agmt ¶ 7. In determining whether this enhancement applies, the Court considers, among other things, the extent to which the defendant rented or owned the premises and the extent to which he controlled the access to or activities there. U.S.S.G. § 2D1.1 n.17. Here, GOMEZ maintained a marijuana grow at his own residence in El

Cerrito, PSR ¶ 31, and he appears to have had some ongoing supervision of the manner in which the organization's gardeners operated the grow equipment in each of the organization's grow houses, id. ¶ 23.  Equally significant, he constructed and maintained the growing infrastructure at other locations the organization used.  This was not simply a matter of clearing a spot on a coffee table for some greenery.  He converted living spaces to manufacturing spaces:  he stripped out carpeting, drapes, and anything else that might harbor mold; he installed new (and illegal) electrical and irrigation systems; he hung and connected the high-intensity lights needed to grow outdoor plants indoors; he installed air conditioning systems and fans to circulate the air and reduce the heat that the high-intensity lights generated; and he cut holes through walls, floors and ceilings to install the air filtration system needed to eliminate the powerful odor of marijuana plants before it was vented to the outside.  And later, he re-visited the grows to address any problems that arose with the equipment he had installed.  Though GOMEZ did not own or rent most of the organization's grow houses, he nonetheless "maintained" the grow operations there.

### 3. Probation Concludes that GOMEZ Was an Organizer or Manager.

Probation concludes that a two-level enhancement under § 3B1.1(c) applies because GOMEZ recruited at least three other persons to participate in the conspiracy (Lingo, Mir and Hinkle), and his statements to Lingo indicate that he exercise at least some supervisory authority over them.  PSR ¶ 41. The government did not insist that GOMEZ admit a role enhancement because he agreed not to seek Safety Valve relief and, thus, the role enhancement had no impact on his Guidelines range.

### 4. GOMEZ Should Receive a Three-Level Deduction for Acceptance.

GOMEZ indicated his intent to plead guilty before the government began preparing for trial against him.  He should receive a three-level deduction for early acceptance of responsibility. U.S.S.G. § 3E1.1.

### 5. GOMEZ Receives a Two-Level Deduction as Part of a Global Resolution.

The Guidelines provide for downward departures "in the exceptional case in which there is present a circumstance that the Commission has not identified in the guidelines but that is nevertheless relevant to determining the appropriate sentence."  U.S.S.G. § 5K2.0(a)(2)(B).  Courts have applied § 5K2.0 and awarded downward departures where multiple defendants join in a group disposition.  See,

e.g., United States v. Garcia, 926 F.2d 125, 128 (2d Cir. 1991) (affirming a 4-level downward departure for a defendant who "broke the log jam" and induced two other defendants to plead guilty); United States v. Mastronardo, 22 F. Supp. 3d 490, 497-98 (E.D. Pa. 2014) (2-level downward departure under § 5K2.0 for 11-defendant global plea); Matera v. United States, 2006 WL 3479067, at *2 (E.D.N.Y. 2006) (four-point deduction for participation in global plea agreement). See also U.S. v. Jesse Aguilar, N.D. Cal. Case No. CR 11-355 EJD Docket #800 (government agreed to 2-level downward variance for all defendants in group disposition).

GOMEZ participated in a group disposition involving seven defendants. As the government has explained before, this group resolution was not only saved significant resources for both the Court and the government, it also changed the dynamic for the remaining defendants and encouraged them to enter settlement negotiations. Moreover, the group of seven GOMEZ joined were among the first defendants to plead guilty. For these reasons, the government agreed to a two-level reduction in his offense level under U.S.S.G. § 5K2.0.

### 6. The Court Must Sentence GOMEZ to At Least 60 Months.

The Superseding Indictment alleges, and GOMEZ admitted, involvement in a conspiracy to manufacture and distribute 100 or more marijuana plants. Plea Agmt ¶ 2. He is thus subject to a 5-year minimum prison term. 21 U.S.C. § 841(b)(1)(B). Under certain circumstances, the Court may impose a sentence less than the statutory minimum. 18 U.S.C. § 3553(f). GOMEZ expressly waived any opportunity that section might have afforded him however,[1] see Plea Agmt ¶ 2, and he affirmed that waiver during his plea colloquy. Accordingly, the Court must sentence him to at least 60 months.

### B. The Government Recommends a 60-Month Prison Term for GOMEZ.

The parties agreed that a reasonable sentence in this case is 60 months. Plea Agmt ¶ 8. The Court must decide whether to accept or reject the parties' agreement. Fed. R. Crim. Proc. 11(c)(3)(A). The Court has broad discretion to accept or reject the plea agreement. United States v. Harris, 679 F.3d 1179, 1182 (9th Cir. 2012). The Court should consider whether the negotiated sentence "is too lenient

---

[1] As explained above, because of GOMEZ's decision and the Guidelines calculation applicable to him, the government was not required to litigate whether he had a role that would have disqualified him from Safety Valve relief in any case. Should this become an issue in the future, the government reserves the right to raise and litigate that issue.

or otherwise not in the public interest in light of the factual circumstances specific to the case." Id. See also United States v. Miller, 722 F.2d 562, 565 (9th Cir. 1983) (categorical rules regarding acceptance or rejection of plea agreements are improper). For the reasons discussed below, the government believes that the negotiated sentence is appropriate and asks that the Court accept the agreement.

GOMEZ was the general contractor for an organization that manufactured and distributed significant quantities of marijuana in several states. And as his own statements indicate, he knew this was a criminal organization; there was no effort to even appear to comply with state law. He knew that his labor was in the service of a criminal organization, with all that meant: street justice, money laundering, destruction of property. Though GOMEZ does not appear to have carried or been involved with firearms or violence, his own statements indicate that he understood that he was enabling that type of conduct. PSR ¶ 32 ("[T]his isn't like school, your mom, or your homies. This is a whole other world that you're walking into . . . [M]aybe this isn't the world you want to be in. My world is different. I already told you, bro, and I thought maybe you were ready, but this is different. . . . You seen the people. You were sitting at the table. Those some real n*****, bro.").

Moreover, GOMEZ was the only person in his role. Though others carried out specific tasks at Oscar's direction, GOMEZ appears to have been the only one who did the construction work necessary to create and maintain the marijuana grows. This kind of work can only be done by people whom the organization trusts because it requires the contractor to know about the illegal operation and where its grow houses are. That information is valuable to rival drug gangs, stick-up crews and law enforcement. GOMEZ thus occupied a significant role in the organization.

Moreover, GOMEZ need not have participated in this conspiracy. Though he has several arrests, PSR ¶¶ 55-57, he has no prior convictions. He has marketable skills and the ability to hold a job. Id. ¶¶ 73-75. His current and past employers said they would re-hire him (presumably) notwithstanding his felony conviction for drug trafficking.[2] And though his parents divorced when he was young, his home life was otherwise stable and he did not face the adversities that often mar the childhoods of defendants

---

[2] GOMEZ reported that his current employer was not aware of his conviction, PSR ¶ 73, and there is no reason why his prior employer would. The government assumes, that they know now however, since U.S. Probation contacted them to verify employment and ask them whether they would rehire GOMEZ.

in criminal cases: poverty, lack of education, addicted and/or violent parents, and trauma. Id. ¶¶ 60-61. Thus, he seems not to have had the same vulnerabilities as others whom Oscar manipulated.

GOMEZ's father suggests that it was GOMEZ's relationship with his girlfriend that led to his joining this criminal scheme. PSR ¶ 63. GOMEZ's girlfriend is a sister of co-defendants Melina Escalante (Oscar's wife), Alfredo Ortiz, and Ignacio Gonzalez. It is not clear from the PSR however, whether their relationship was the reason for his joining Oscar's organization, or an outgrowth of it. Indeed, GOMEZ reports a long history of drug use, PSR ¶¶ 68-70, and has had a few prior contacts with law enforcement, id. ¶¶ 55-57. Thus GOMEZ already may have been running in the same circles as Oscar and his associates at the time he began his relationship with Oscar's sister-in-law.[3] It is possible that GOMEZ found her through them, rather than the other way around, as GOMEZ's father suggests.

Whatever GOMEZ's reasons for joining Oscar's organization, GOMEZ was committed to it, as his statements to Lingo indicate. GOMEZ refers to a "whole other world" that he belongs to, and says that there is "so much other stuff going on" that "we don't got time to pay attention to what you got going on." PSR ¶ 32. Indeed, the whole point of GOMEZ's lecture was performance management: he had an employee who was not performing as expected and he was admonishing the employee about communication skills and personal accountability. Only someone invested in the business' success gives that lecture. GOMEZ told Probation that he worked for Oscar because Oscar provided him drugs and a way to earn extra money. PSR ¶ 36. That may be part of the story, but it is not the whole story. His admonitions to Lingo were sober and clear-headed, and there was not a bit of hesitation in his voice. They were not the statements of a captive. The statutory minimum thus is commensurate to GOMEZ's involvement and culpability and represents an appropriately severe sentence, especially for someone who has no prior prison or jail terms.

A 60-month sentence in this case is consistent with the sentences other defendants have received or will receive. GOMEZ is closest in culpability to Phillip Jiunti, Ignacio Gonzalez, and Oswaldo Escalante. Like GOMEZ, the other three defendants were charged only in the marijuana conspiracy:

---

[3] GOMEZ reports that he was a heavy drug user, but he also seems to have stopped using, without any treatment assistance, after he was arrested in this case. Probation notes that he had two (possibly three) positive drug tests while on pre-trial release. PSR ¶ 69. There were never any Form 8s filed, and the government was unaware of these violations until the publication of the PSR.

GOV'T SENTENCING MEM. 8
CR 16-382 HSG

Jiunti and Gonzalez were gardeners who worked in the grows GOMEZ constructed, and Oswaldo operated his own portfolio of grow houses and employed his own workers. Like GOMEZ, neither Jiunti nor Oswaldo was charged with a firearm offense. Unlike GOMEZ, Jiunti was involve for just a short time – just a couple weeks. This suggests a lower sentence than GOMEZ. But Jiunti had an extensive criminal history and was on federal supervised release when he committed this offense – factors that suggest a longer sentence. The Court sentenced Jiunti to 70-months in prison – this term included time for the supervised release violation.

Oswaldo, on the other hand, was involved in the conspiracy for a long time, as was GOMEZ. Oswaldo was more of a leader however: whereas the people GOMEZ recruited worked for Oscar, Oswaldo's employees worked for Oswaldo. And Oswaldo participated in the money laundering scheme. GOMEZ did not, so far as the government is aware. Neither GOMEZ nor Oswaldo was charged with a firearms offense. The government agreed to a 65-month prison term for Oswaldo, which represents a modest increase to account for Oswaldo's increased culpability.

The comparison to Gonzalez is less direct: like GOMEZ, Gonzalez was involved in this conspiracy for a long time, but as a gardener. Unlike GOMEZ, Gonzalez possessed a firearm, which he admitted was to protect the grow house. And unlike GOMEZ, Gonzalez suffers from significant cognitive deficits as a result of a head injury he received years ago. Though Gonzalez's conduct, in itself, would warrant a more severe penalty, his personal characteristics warrant more lenity than GOMEZ's. On balance, it is fair to impose roughly equal sentences on both men. The government agreed to approximately 60 months for Gonzalez.

A 60-month sentence for GOMEZ is thus commensurate to the sentences that other similarly-situated defendants received, and accounts for the differences in their respective roles in the conspiracy. It also maintains adequate separation between GOMEZ's sentence and the sentences that those involved in the hard drug conspiracy have received or will receive: Oscar was the conspiracy's ringleader and received a 235-month sentence – roughly four times longer than GOMEZ's sentence; the government agreed to a 120-month sentence for David Vigil, roughly twice the sentence the government agreed to for GOMEZ. Imposing a 60-month sentence thus will not create any unwarranted sentencing disparities.

///

## IV. CONCLUSION

For the foregoing reasons, the government recommends that the Court accept the parties' agreed resolution and sentence GOMEZ to 60 months imprisonment, followed by 4 years of supervised release on the terms Probation recommends.

DATED: June 11, 2018

Respectfully submitted,

ALEX G. TSE
Acting United States Attorney

    /s/
FRANK J. RIEBLI
KATHERINE L. WAWRZYNIAK
Assistant United States Attorney